# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>PO Box 14596<br>Washington, DC 20044<br><br>    *Plaintiff*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br>Office of the General Counsel<br>245 Murray Lane, SW, Mail Stop 0485,<br>Washington, DC 20528-0485, and<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES<br>Office of the Chief Counsel<br>5900 Capital Gateway Drive<br>Mail Stop 2120<br>Camp Springs, MD 20588-0009<br><br>    *Defendants*. | Case No. _____ |

## **COMPLAINT**

1.      Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") brings this action for declaratory and injunctive relief against Defendants, the United States Department of Homeland Security ("DHS") and United States Citizenship and Immigration Services ("USCIS"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

2.      The Systematic Alien Verification for Entitlements ("SAVE") program is an online service administered by defendant USCIS. It was originally designed to assist federal and local agencies to verify the citizenship or immigration status of noncitizens and naturalized citizens who

were born outside of the United States prior to granting benefits and licenses to them.

3.      Since President Trump returned to office in January 2025, however, Defendants have drastically expanded the data available through the SAVE program and have lowered the barriers for states to access this broader set of information, purportedly to encourage state agencies to search across citizens' and immigrants' personal data and then purge their voter rolls of those that the state agencies claim to be ineligible to vote based on that data.

4.      As part of this expansion, Defendants have made available through the SAVE program sensitive data from the Social Security Administration ("SSA") that was neither collected to determine individuals' citizenship or immigration status nor has been updated to reflect such information accurately.

5.      At the same time, Defendants have expanded search functionality within the SAVE program beyond the single-person queries for which it was designed to allow federal and state agencies the unprecedented ability to search this expanded, sensitive, and unreliable data *en masse*.

6.      The Administration's rapid expansion of the SAVE program has raised substantial concern about the accuracy of the information within it and the safeguards in place to protect personally identifiable information.

7.      To access data housed in the SAVE program, states, state entities, and state subdivisions enter into agreements with Defendants setting forth the terms by which the data may be accessed and utilized.

8.      On April 9, 2025, and September 3, 2025, CREW filed FOIA requests for these data sharing agreements and other records with DHS to shed light on how it is permitting states to access and use federal data to verify voting eligibility and, potentially, to purge voting rolls.  On August 26, 2025, CREW filed a similar FOIA request with DHS component USCIS.  The August and September requests sought expedited processing.  Defendants, however, have by inaction

denied CREW's requests for expedited processing and have failed to timely process CREW's requests in compliance with FOIA.

9.    CREW now seeks declaratory and injunctive relief requiring Defendants to process CREW's FOIA requests on an expedited basis, preserve all records potentially responsive to CREW's requests, and promptly disclose the requested records.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331, 2201, and 2202.

11.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

12.    Because Defendants have failed to comply with the applicable time-limit provisions of FOIA, CREW is deemed to have exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i) and is now entitled to an order requiring Defendants to process its FOIA requests.

## PARTIES

13.    Plaintiff CREW is a non-partisan, non-profit government watchdog organization committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring ethics, transparency, and integrity in government. To advance its mission, CREW uses a combination of research, litigation, and advocacy. As part of its research, CREW routinely uses government records made available to it under FOIA, the Federal Advisory Committee Act, and other federal laws, and widely disseminates those records to the public.

14.     Each Defendant is an agency within the meaning of 5 U.S.C. § 552(f)(1), has possession and control of the requested records, and is responsible for fulfilling CREW's FOIA requests.

## STATEMENT OF FACTS

### The SAVE Program

15.     The SAVE program is an online service administered by USCIS, a component of DHS, that provides immigration status and naturalized U.S. citizenship information to federal, state, local, territorial, and tribal agencies.  According to USCIS, the SAVE program was designed to assist agencies verify citizenship and immigration status prior to granting benefits and licenses to noncitizens or persons with naturalized citizenship. *See* About SAVE, USCIS (last updated May 22, 2025), https://www.uscis.gov/save/about-save/about-save.

16.     According to USCIS, at last count about 1,200 agencies nationwide use SAVE to assist them in making benefit eligibility and licensing determinations in the areas of health care benefits, social security benefits, education grants and assistance, state driver's licenses and ID cards, and occupational and professional licenses. *See* Current User Agencies, USCIS (last updated Nov. 7, 2024), https://www.uscis.gov/save/current-user-agencies.

17.     The SAVE program is not a comprehensive database of U.S. citizens.  It is, instead, a tool for users to query information in various datasets.  To obtain access to SAVE, a governmental entity must enter into an agreement or memorandum of understanding with USCIS which sets forth the terms by which the entity may use the SAVE program and any restrictions placed on that use.  *See* Register an Agency for SAVE, USCIS (last updated Jul. 17, 2025), https://www.uscis.gov/save/prospective-user-agencies/register-an-agency-for-save.

18.     On July 9, 2012, 13 states petitioned DHS for access to the SAVE program to identify noncitizens for the purpose of purging their voter rolls.

19.    In Florida, one of those states, the Secretary of State used the SAVE program to identify non-citizens on the voter rolls. Subsequently, two Florida residents who were wrongly identified in the SAVE program as non-citizens were found to have standing to challenge the Secretary's use of the SAVE program for this purpose prospectively, because "there was a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341 (11th Cir. 2014). They were ultimately permitted to vote.

20.    Until recently, the SAVE program could only be searched using a DHS-issued immigration identifier, such as an Alien Registration Number or a naturalization certificate number, and only to search DHS records, which did not include records of U.S.-born citizens. Thus, SAVE could only be used to verify naturalized and some derived citizens and had limited utility in the voting context because most voters, as U.S.-born citizens, do not have a DHS-issued immigration identifier. In addition, only one identifying number could be entered into the SAVE program at a time.

21.    The Trump Administration has since made a number of substantial changes to the SAVE program to include data on virtually all American citizens and immigrants, to subject that data to batch searches and data scrapes, and to encourage state and local governments to use that data to verify individuals' citizenship and immigration status.

22.    On January 24, 2025, USCIS updated a SAVE guidance document affirming that state and local governments responsible for voter registration can use the SAVE program to "verify an individual's immigration status and naturalized U.S. citizenship." *See* Voter Registration and Voter List Maintenance Fact Sheet, USCIS (last updated Aug. 27, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

23.    Starting in May 2025, DHS obtained access to data from SSA for use in the SAVE program.  *See* Press Release, USCIS Deploys Common Sense Tools to Verify Voters, USCIS (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.  That SSA data allows entities searching the SAVE database to query it using a voter's Social Security number.  As USCIS explains:

> SAVE optimized its service in 2025 to better serve voter verification agencies. This optimization allowed agencies accessing SAVE through a web browser to create cases using a Social Security number (SSN) and to create cases in bulk . . . When a user agency creates a case using an SSN, SAVE first queries SSA databases. Based on SSA data, SAVE can verify the U.S. citizenship of most U.S.-born individuals as well as check the SSA Death Master File.

*See* Voter Registration and Voter List Maintenance Fact Sheet, USCIS (last updated Aug. 27, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

24.    In addition, the SAVE program's functionality has been expanded to allow accessing agencies to make bulk requests for thousands of people at a time.  *Id.*

25.    SSA data may not, however, accurately list persons who are U.S. citizens.  When an individual applies for a Social Security number and accompanying card, they disclose their then-present citizenship status.  SSA, however, has no methodology for updating that citizenship status, apart from self-reporting by the cardholder.  A person who applied for a Social Security number as a non-citizen, then, may still have that listed status in the SSA records even though the person subsequently became a U.S. citizen.  Further, SSA does not maintain comprehensive citizenship information for people born prior to 1978.

26.    In addition to concerns about the accuracy of the SAVE datasets, use of bulk Social Security numbers as a means to access those datasets calls into question the steps, if any, USCIS is using to safeguard and protect this highly sensitive personal information.

27.    As of October 8, 2025, 20 states and 45 state subdivisions within those states were registered with the SAVE program for purposes of voter registration and voter list maintenance.

*See* SAVE Agency Search Tool, USCIS (accessed Oct. 8, 2025),

https://www.uscis.gov/save/about-save/save-agency-search-tool.  It is in the public's interest for

these data sharing agreements to be released so that it can know what data states may be using to

maintain their voter rolls and registration, considering that the SAVE program can lead to

misidentifications between citizens and noncitizens.

## STATUTORY FRAMEWORK

28.    Agencies shall grant requesters requests for expedited processing of their FOIA

requests when they demonstrate "compelling need."  5 U.S.C. § 552(a)(6)(E)(i)(I).  "Compelling

need" requires the requestor to show that they are "a person primarily engaged in disseminating

information" with an "urgency to inform the public concerning actual or alleged Federal

Government activity."  5 U.S.C. § 552(a)(6)(E)(v)(II).

29.    A determination of whether to provide expedited processing shall be made, and

notice of the determination shall be provided to the person making the request, within 10 days

after the date of the request.  5 U.S.C. § 552(a)(6)(E)(ii)(I).

30.    Agency action to deny a request for expedited processing, and failure by an agency

to respond in a timely manner to such a request, is subject to judicial review.  5 U.S.C.

§ 552(a)(6)(E)(iii).

31.    Upon receipt of a FOIA request, an agency must make a determination whether to

comply with it and notify the requester of that determination within twenty days of receipt of a

request, excluding Saturdays, Sundays, and legal public holidays.  5 U.S.C. § 552(a)(6)(A)(i).

32.    Moreover, the FOIA provides that "each agency, upon any request for records

which (i) reasonably describes such records and (ii) is made in accordance with published rules

. . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).

33.    After a FOIA request is received by an agency, it must "make reasonable efforts to

search for the records." 5 U.S.C. § 552(a)(3)(C). If the agency identifies any responsive records,

the agency must make them "promptly available." *Id.*

34.     If an agency fails to make a determination within the prescribed time frame,

requesters are deemed to have exhausted their administrative remedies under 5 U.S.C.

§ 552(a)(6)(C)(i).

**CREW'S FOIA Requests**

Department of Homeland Security – April 9, 2025 Request

35.     On April 9, 2025, CREW filed a FOIA request with the DHS in which it requested

the following records:

1.  From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official providing access to the Systematic Alien Verification for Entitlements (SAVE) program. This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2.  From January 24, 2025 to the date this request is processed, all agency records relating to election officials' access to or use of the SAVE program, including:

    a.  All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

    b.  The scope, terms, and conditions of election officials' access to or use of information taken from the SAVE program; and

    c.  Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

3.  From July 1, 2019 to the date this request is processed, all formal or informal data sharing agreements between DHS and the Census Bureau through which DHS and the Census Bureau share personally identifiable information or immigration status information. This request includes:

    a.  All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

    b.  The scope, terms, and conditions of the Census Bureau's access to or use of

personally identifiable information or immigration status information from DHS, or vice-versa; and

   c. Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS or the Census Bureau.

4. From July 1, 2019 to the date this request is processed, all formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the Census Bureau's access to or use of personally identifiable information or immigration status information from DHS, or vice-versa.

5. From February 27, 2025 to the date this request is processed, all agency records related to the sharing of personally identifiable information, immigration data, or tax data between DHS and the Internal Revenue Service (IRS). This request includes:

   a. All formal or informal agreements between the IRS and DHS to share personally identifiable information, immigration information, or tax data, including from persons with Individual Tax Identification Numbers (ITINs), and including records related to the April 7, 2025 Memorandum of Understanding between DHS and the IRS "For Exchange of Information for Nontax Criminal Enforcement" (the "2025 agreement");

   b. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the DHS's use of personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS;

   c. The scope, terms, and conditions of DHS's access to personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS;

   d. Privacy or data security safeguards for protecting personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS.

6. From January 20, 2025 through March 17, 2025, all DHS requests to the IRS for the return information of taxpayers.

7. From April 8, 2025 to the date this request is processed, all DHS requests to the IRS for the return information of taxpayers pursuant to the 2025 agreement. (footnotes omitted).

A copy of this FOIA request is attached as Exhibit A.

36.   CREW's FOIA request stated that, because litigation is reasonably foreseeable,

DHS should institute an agency-wide preservation hold on all documents potentially responsive to the request.

37.    CREW's FOIA request asked DHS to search for responsive records regardless of format, medium, or physical characteristics. CREW stated that it sought records of any kind, including paper records, electronic records, audiotapes, videotapes, photographs, data, and graphical material, and included without limitation all correspondence, letters, emails, text messages, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions and e-mail attachments.

38.    In its April 9, 2025, FOIA request, CREW sought a fee waiver in accordance with 5 U.S.C. § 552(a)(4)(A) and agency regulations.

39.    CREW stated that the subject of the FOIA request concerned the operations of the federal government and that the disclosures likely will contribute to a better understanding of government procedures and public policy in a significant way. CREW also stated that the records were sought for primarily and fundamentally non-commercial purposes.

40.    In addition, CREW's request stated that it should not be charged search or review fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it qualifies as a member of the news media. CREW routinely disseminates information obtained through FOIA. Given the intense public interest in these records, CREW will disseminate to the public any records that it receives as a result of the request filed.

41.    On August 26, 2015, CREW submitted a request for expedited processing on subparts 1 and 2 of the April 9, 2025, request pursuant to 5 U.S.C. § 552 and 6 C.F.R. § 5.5(e).

42.    CREW explained in detail that it was entitled to expedited processing because the facts demonstrate that (1) the request concerns a matter of current exigency to the American public; (2) the consequences of delaying a response would compromise a significant recognized

interest; and (3) the request concerns federal government activity and because CREW "is primarily engaged in disseminating information."  A copy of this letter is attached as Exhibit B.

43.     Specifically, CREW stated that the requested records concern a matter of current exigency to the American public insofar as the scope of coordination between DHS and state election officials who may be using the SAVE program to verify voter registration information may disenfranchise eligible voters seeking to participate in upcoming elections across the country in November 2025.

44.     It argued that, because the SAVE program contains inaccurate and incomplete information, its use raises serious and immediate concerns about voter access and the risk of erroneous disenfranchisement.  It stated that, "[W]ithout timely public disclosure of how state election officials are using SAVE, voters will lack critical information about whether their rights may be compromised due to the misidentification of eligible voters as non-citizens.  Given the immediacy of election deadlines—such as voter registration cutoffs, mail-in ballot processing, and early voting schedules—eligible voters must be informed quickly in order to determine how and whether to engage with their election officials to avoid potential disenfranchisement."

45.     Further, CREW stated that, "delaying voters' access to information about the nature of election officials' access to or use of information taken from the SAVE program would result in the impairment of citizens' fundamental right to participate in the electoral process. Voting is constitutionally and statutorily protected as a cornerstone of democratic participation. Depending on the terms of the data sharing agreements between DHS and states, as well as any other conditions or safeguards set by DHS or election officials themselves, the use of the SAVE program in state election verification processes could lead to the wrongful disenfranchisement of eligible voters. Failure to promptly release the requested records would allow potentially unlawful practices to continue without public scrutiny."

46.     In addition, in support of expedition, CREW argued that "the coordination between USCIS and state election officials through the SAVE program has generated 'widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.' 6 C.F.R. § 5.5(e)(1)(iv). The involvement of the SAVE program in state voter verification efforts has already drawn national attention, including the potential for misapplication of immigration databases in the context of elections, underscoring public concern about federal overreach and data misuse. There are growing questions about the transparency and legality of the agency's coordination with state officials, particularly given the SAVE program's acknowledged limitations." Ex. B.

47.     DHS has not responded to CREW's April 9, 2025 FOIA request or its August 26, 2025 request for expedited processing, as required by the statute.

48.     More than ten days have passed since the request for expedited processing was made. DHS has therefore failed to comply with 5 U.S.C. § 552(a)(6)(e)(ii)(1).

49.     More than twenty days have passed since CREW submitted its April 9, 2025, request and Defendant DHS has therefore failed to comply with 5 U.S.C. § 552(a)(6)(A)(i).

50.     As a result, CREW has constructively exhausted its administrative remedies, 5 U.S.C. § 552(a)(6)(C)(i), and seeks immediate judicial review.

<u>Department of Homeland Security – September 3, 2025 Request</u>

51.     On September 3, 2025, CREW submitted a FOIA request in which it sought the following records:

1.  From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official providing access to the Systematic Alien Verification for Entitlements (SAVE) program. This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2.  From January 24, 2025 to the date this request is processed, all agency records

sufficient to show:

    a.  All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

    b.  The scope, terms, and conditions of election officials' access to or use of information taken from the SAVE program; and

    c.  Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

52.    CREW's FOIA request asked DHS to search for responsive records regardless of format, medium, or physical characteristics. CREW stated that it sought records of any kind, including paper records, electronic records, audiotapes, videotapes, photographs, data, and graphical material, and included without limitation all correspondence, letters, emails, text messages, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions and e-mail attachments.

53.    In its September 3, 2025, FOIA request, CREW sought a fee waiver in accordance with 5 U.S.C. § 552(a)(4)(A) and agency regulations.

54.    CREW stated that the subject of the FOIA request concerns the operations of the federal government and that the disclosures likely will contribute to a better understanding of government procedures and public policy in a significant way. CREW also stated that the records were sought for primarily and fundamentally non-commercial purposes.

55.    In addition, CREW's request stated that it should not be charged search or review fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it qualifies as a member of the news media. CREW routinely disseminates information obtained through FOIA. Given the intense public interest in these records, CREW will disseminate to the public any records that it receives as a result of the request filed.

56.    CREW included in the September 3, 2025, submission a request for expedited

processing pursuant to 5 U.S.C. § 552 and 6 C.F.R. § 5.5(e). Because both the April 9, 2025, and September 3, 2025, requests seek similar information, CREW's basis for seeking expedited processing is identical to the explanation provided in its August 26, 2025, request. A copy of this letter is attached as Exhibit C.

57.     On September 18, Defendant DHS responded with an acknowledgement letter stating that, "[d]ue to the subject matter of your request," DHS is "transferring this request to the FOIA Officer for USCIS for processing under the FOIA."

58.     As of the date of filing this Complaint, neither Defendant has further responded to CREW's September 3, 2025, request. As of the date of filing this Complaint, Defendants have not responded to CREW's request for expedited processing.

59.     More than ten days have passed since the request for expedited processing was made. DHS has therefore failed to comply with 5 U.S.C. § 552(a)(6)(e)(ii)(1).

60.     More than twenty days have passed since CREW submitted its September 3, 2025, request and Defendant DHS ha therefore failed to comply with 5 U.S.C. § 552(a)(6)(A)(i).

61.     As a result, CREW has constructively exhausted its administrative remedies, 5 U.S.C. § 552(a)(6)(C)(i), and seeks immediate judicial review.

<u>USCIS – August 26, 2025 Request</u>

62.     On August 26, 2025, CREW filed a FOIA request with Defendant USCIS.  The request for records, request for a fee waiver and request for expedited processing were identical to that in CREW's September 3, 2025, request to DHS. A copy of this FOIA request is attached as Exhibit D. On September 3, CREW emailed an updated version of this letter which resolved broken links and a small number of typos.

63.     USCIS sent CREW an automated confirmation of submission on August 26, 2025. It has not otherwise responded to CREW's request for records or expedited processing.

64.     More than ten days have passed since the request for expedited processing was made. USCIS has therefore failed to comply with 5 U.S.C. § 552(a)(6)(e)(ii)(1).

65.     More than twenty days have passed since CREW submitted its request, and Defendant USCIS has therefore failed to comply with 5 U.S.C. § 552(a)(6)(A)(i).

66.     As a result, CREW has constructively exhausted its administrative remedies, 5 U.S.C. § 552(a)(6)(C)(i), and seeks immediate judicial review.

## PLAINTIFF'S CLAIMS

### Count I
### Wrongful Denial of Expedited Processing Requests
### (5 U.S.C. § 552)

67.     Plaintiff repeats and realleges paragraphs 1-66 as if they were fully set forth herein.

68.     Pursuant to the FOIA and applicable agency regulations, on August 26, 2025, and September 3, 2025, CREW sought expedited processing of the FOIA requests it had filed with Defendants.

69.     As an organization with a mission to uncover and to reveal to the public the activities of the federal government, CREW is primarily engaged in disseminating information.

70.     With important elections coming in November 2025 and 2026, public understanding of the data sharing agreements in question and how they have been implemented to permit state agencies to gain access to federal data for purposes of checking their voter rolls is of utmost importance, particularly given substantial concern about the accuracy of the relevant datasets and the potential for disclosure of sensitive personal information.

71.     FOIA requires agencies to determine whether to provide expedited processing and to provide notice of the determination to the person making the request within 10 days after the date of the request. 5 U.S.C. § 552(a)(6)(E)(ii)(1).

72.     In violation of that statute, Defendants did not respond to CREW's expedited

processing requests of August 26, 2025, and September 3, 2025, within 10 days.

## Count II
## Wrongful Withholding of Records
### (5 U.S.C. § 552)

73.     Plaintiff repeats and realleges paragraphs 1-66 as if they were fully set forth herein.

74.     In its April 9, 2025 and September 3, 2025 requests to DHS, and its August 26, 2025 FOIA request to USCIS (corrected on September 3, 2025), CREW properly sought records within the custody and control of Defendants.

75.     Defendants wrongfully withheld agency records requested by CREW by failing to make determinations on CREW's requests within the statutorily prescribed time period of 20 business days, as required by 5 U.S.C. § 552(a)(6)(A), and by continuing to withhold documents that are non-exempt and responsive to CREW's FOIA requests.

76.     CREW has constructively exhausted its administrative remedies.

77.     Accordingly, CREW is entitled to injunctive and declaratory relief requiring Defendants to immediately process and disclose all requested records to CREW.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests this Court:

1. Issue a declaration that CREW is entitled to the immediate processing and disclosure of the requested records to it;

2. Issue a declaration that CREW is entitled to expedited processing of all requests for which it has sought such handling;

3. Order Defendants to preserve all records, in whatever form they exist, potentially responsive to CREW's requests prior to and during the processing of its requests;

4. Order Defendants to immediately process and disclose all responsive records to CREW;

5. Order Defendants to grant CREW's requests for fee waivers;

6. Provide for expeditious processing of this action;

7. Retain jurisdiction over this action to ensure that no agency records are wrongfully withheld;

8. Award Plaintiff attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(F)(i); and

9. Grant any other such relief that this Court may deem just and proper.


Dated: October 20, 2025                            Respectfully submitted,

                                                    *Jeffrey S. Gutman*
                                                   Jeffrey S. Gutman (D.C. Bar No. 416954)
                                                   Jeffrey S. Gutman, PLLC
                                                   1712 Hobart St., N.W.
                                                   Washington, D.C. 20009
                                                   (202) 631-5129
                                                   jsgutmandc@gmail.com


                                                    *Kayvan Farchadi*
                                                   Kayvan Farchadi (D.C. Bar No. 1672753)
                                                   Jonathan E. Maier (D.C. Bar No. 1013857)
                                                   CITIZENS FOR RESPONSIBILITY AND
                                                   ETHICS IN WASHINGTON
                                                   P.O. Box 14596
                                                   Washington, D.C. 20004
                                                   Telephone: (202) 408-5565
                                                   Fax: (202) 588-5020
                                                   kfarchadi@citizensforethics.org
                                                   jmaier@citizensforethics.org

                                                   *Counsel for Plaintiff*

Exhibit A



April 9, 2025

Roman Jankowski
Chief FOIA Officer
Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. AVE SE
Washington, DC 20528-065

**Re:  Freedom of Information Act Request**

Dear FOIA Officer:

Citizens for Responsibility and Ethics in Washington ("CREW") submits this request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Department of Homeland Security ("DHS") regulations.

Specifically, CREW requests:

1. From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official[1] providing access to the Systematic Alien Verification for Entitlements (SAVE) program.[2] This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2. From January 24, 2025 to the date this request is processed, all agency records[3] relating to election officials' access to or use of the SAVE program, including:
   a. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;
   b. The scope, terms, and conditions of election officials' access to or use of information taken from the SAVE program; and
   c. Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

---

[1] "Election official" here is used to describe any state or local official involved in state or federal election administration, including a state's chief election official and members of election boards and commissions.
[2] *See* SAVE Agency Search Tool, USCIS, https://www.uscis.gov/save/about-save/save-agency-search-tool.
[3] "Agency records" here is used within the meaning of 5 U.S.C. § 552 and, unless otherwise indicated, all "agency records" sought in this FOIA request and each of its numbered and lettered subparts include communications sent or received by DHS regarding the subject matter described in that subpart.

April 9, 2025
Page 2

3. From July 1, 2019 to the date this request is processed, all formal or informal data sharing agreements between DHS and the Census Bureau through which DHS and the Census Bureau share personally identifiable information or immigration status information.[4] This request includes:
   a. The scope, terms, and conditions of the Census Bureau's access to or use of personally identifiable information or immigration status information from DHS, or vice-versa; and
   b. Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS or the Census Bureau.

4. From July 1, 2019 to the date this request is processed, all formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the Census Bureau's access to or use of personally identifiable information or immigration status information from DHS, or vice-versa.

5. From February 27, 2025 to the date this request is processed, all agency records related to the sharing of personally identifiable information, immigration data, or tax data between DHS and the Internal Revenue Service (IRS). This request includes:
   a. All formal or informal agreements between the IRS and DHS to share personally identifiable information, immigration information, or tax data, including from persons with Individual Tax Identification Numbers (ITINs), and including records related to the April 7, 2025 Memorandum of Understanding between DHS and the IRS "For Exchange of Information for Nontax Criminal Enforcement" (the "2025 agreement");
   b. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning the DHS's use of personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS;
   c. The scope, terms, and conditions of DHS's access to personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS;
   d. Privacy or data security safeguards for protecting personally identifiable information, immigration information, or tax data of individuals received by DHS from the IRS.

6. From January 20, 2025 through March 17, 2025, all DHS requests to the IRS for the return information of taxpayers.

7. From April 8, 2025 to the date this request is processed, all DHS requests to the IRS for the return information of taxpayers pursuant to the 2025 agreement.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including paper records, electronic records,

---

[4] *See DHS/ALL/PIA-079 DHS Immigration-Related Information Sharing with U.S. Census Bureau,* U.S. Dep't of Justice (Dec. 20, 2019), https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-november2020.pdf. *See also* Exec. Order No. 13880, 84 C.F.R. 33821 (2019).

April 9, 2025
Page 3

audiotapes, videotapes, photographs, data, and graphical material. Our request includes without limitation all correspondence, letters, emails, text messages, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions. Our request also includes any attachments to emails and other records, and anyone who was cc'ed or bcc'ed on any emails.

If it is your position any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). If some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. *See* 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. *See Mead Data Central v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

Please be advised that CREW intends to pursue all legal remedies to enforce its rights under FOIA. Accordingly, because litigation is reasonably foreseeable, the agency should institute an agencywide preservation hold on all documents potentially responsive to this request.

## **Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A) and agency regulations, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures likely will contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. *See id.* § 552(a)(4)(A)(iii). Moreover, the request primarily and fundamentally is for non-commercial purposes. *See, e.g., McClellan Ecological v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987).

The SAVE program is an online service administered by U.S. Citizen and Immigration Services (USCIS) that provides immigration status and naturalized U.S. citizenship information to federal, state, local, territorial, and tribal agencies.[5] The SAVE program does not verify citizenship status for U.S. born citizens.[6] The SAVE program was designed to help agencies verify citizenship and immigration status prior to granting benefits and licenses to noncitizens or persons with naturalized citizenship who were born outside of the U.S.[7]

On July 9, 2012, 13 states petitioned DHS for access to the SAVE program to identify noncitizens to purge their voter rolls.[8] In 2014, the Eleventh Circuit held that two Florida

---

[5] *About SAVE*, U.S. Citizen and Immigration Services (Nov. 7th, 2024), https://www.uscis.gov/save/about-save/about-save.

[6] *Id.*

[7] *See Systematic Alien Verification for Entitlements (SAVE) Program*, DHS (Jun. 2020), https://docs.google.com/document/d/1Jz6wSgg8cCzleBQP6TS7pS63RpxY9IzxyPF9NWYjbRA/edit?tab=t.0.

[8] *See* U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf (citing Scott Gessler, *Letter from Scott Gessler, Colorado Secretary of State, to Janet Napolitano, Secretary of U.S. Dep't of Homeland Security*

April 9, 2025
Page 4

residents who were naturalized U.S. citizens had standing to challenge Florida's use of the SAVE program because there was a "realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process."[9]

While the SAVE program was created to verify eligibility for government benefits and licensing, not to verify an individual's eligibility to vote,[10] as of March 14th, 2025 ten states were registered with the SAVE program for purposes of voter registration and voter list maintenance.[11] In addition, on January 24, 2025, USCIS updated a SAVE guidance document affirming that state and local governments responsible for voter registration can use the SAVE program to "verify an individual's immigration status and naturalized U.S. citizenship."[12]

Some organizations have reported that the SAVE program "contains outdated information and can result in false matches between citizens and noncitizens who have the same name and birthdate."[13] A 2018 report noted that the SAVE program did not include all naturalized citizens and did not include citizens born to U.S. parents outside of the United States.[14] USCIS also noted in their updated guidance published on January 24th, 2025, that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status, like a foreign-born child of U.S. citizens, if they have not applied for a Certificate of Citizenship,[15] which carries a cost of $1,385.[16]  It is therefore in the public's interest for these data sharing agreements to be released and to know what data states may be using to maintain their voter rolls and registration, considering that the SAVE  program can lead to misidentifications between citizens and noncitizens.[17]

(July 9, 2012),
https://docs.google.com/document/d/1jz6wSgg8cCzleBQP6TS7pS63RpxY9IzxyPF9NWYjbRA/edit?tab=t.0 ).

[9] *Arcia v. Florida Sec'y of State*, 772 F. 3d 1335, 1341 (11th Cir. 2014).

[10] Michele Waslin, *Using SAVE to Verify Voter Eligibility Comes with Unexplored Risks*, Immigration Impact (Aug. 2, 2012),
https://immigrationimpact.com/2012/08/02/using-save-to-verify-voter-eligibility-comes-with-unexplored-risks/.

[11] State officials from Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia are registered with the SAVE program for the purposes of Voter Registration and Voter List Maintenance. *See SAVE Agency Search Tool*, U.S. Citizenship and Immigration Services (last visited Mar. 14, 2025),
https://www.uscis.gov/save/about-save/save-agency-search-tool?benefit_category%5B%5D=97&benefit_category%5B%5D=98&items_per_page=50&benefit_category%5B0%5D=17.

[12] *Voter Registration and Voter List Maintenance Fact Sheet*, U.S. Citizenship and Immigration Services  (Jan. 24, 2025),
https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

[13] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/.

[14] U.S. Comm'n on Civil Rights,  *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

[15] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services,
https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet#_ftn2.

[16] *See* Calculate Your Fees, Form N-600, Application for a Certificate of Citizenship, U.S. Citizenship and Immigration Services, https://www.uscis.gov/feecalculator?form=n-600.

[17] U.S. Comm'n on Civil Rights,  *An Assessment of Minority Voting Rights Access in the United States* 149, (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

April 9, 2025
Page 5

        In addition to the data-sharing agreements between DHS and state election officials, it is also in the public's interest for DHS to release any data sharing agreements related to sharing personally identifiable information and immigration status information between DHS and the Census Bureau.[18] Census experts have found that using immigration information in census surveying leads to an unsuccessful Census.[19] News outlets have reported that the data sharing agreements between DHS and the Census Bureau could have led to undercounting in the 2020 census, which would have negatively affected the amount of funding and resources that communities across the United States received after the 2020 census.[20] Reports suggest that President Trump's attempt to require citizenship information in the responses to the 2020 census contributed to Latinos having an undercount rate of 4.99% in the 2020 census, a 3.45% increase from the Latino undercount rate in the 2010 census.[21]

        Census data affects how governments provide funding to communities and how governments determine congressional representation.[22] As a result, the undercounting of certain communities in the census can lead to a loss of political power and resources in those communities.[23] For these reasons, the public has an interest in the disclosure of any data sharing agreements between DHS and the Census Bureau that relate to sharing immigration status information.

        Lastly, it is in the public's interest for DHS to disclose any agreements that it has discussed with the IRS to share individual's personally identifiable information, immigration information, or tax data. DHS has reportedly indicated that it will be seeking confidential tax data from the IRS to locate up to 7 million immigrants who have been paying taxes.[24]  IRS

---

[18] *See* Hansi Lo Wang, *To Produce Citizenship Data, Homeland Security To Share Records With Census*, NPR (Jan. 4, 2020), https://www.npr.org/2020/01/04/793325772/to-produce-citizenship-data-homeland-security-to-share-records-with-census.

[19] *See* Tara Bahrampour, *DHS Plan To Share Noncitizens' Data With Census Bureau Could Further Frighten Immigrants, Experts Say*, Wash. Post (Mar. 8, 2019), https://www.washingtonpost.com/local/social-issues/dhs-plan-to-share-non-citizens-data-with-census-bureau-could-further-spook-immigrants-experts-say/2019/03/08/2feafc5c-4129-11e9-9361-301ffb5bd5e6_story.html.

[20] *See* Tara Bahrampour, *DHS Plan To Share Noncitizens' Data With Census Bureau Could Further Frighten Immigrants, Experts Say*, Wash. Post (Mar. 8, 2019), https://www.washingtonpost.com/local/social-issues/dhs-plan-to-share-non-citizens-data-with-census-bureau-could-further-spook-immigrants-experts-say/2019/03/08/2feafc5c-4129-11e9-9361-301ffb5bd5e6_story.html (finding that the DHS's plan to share noncitizens' information with the Census Bureau could make immigrants feel like responding to the Census would be unsafe, undermining the integrity of the Census count). *See also The Power of Latinos in American Democracy: Best Practices & Innovations for Overcoming Inequities in Latino Civic Engagement*, Mi Familia Vota & Mi Familia en Acción 36 (2024), https://www.mifamiliavota.org/wp-content/uploads/sites/2/2024/08/MFA_C3_Report_08-21-2024_WEB.pdf (finding that attempts to use immigration status in Census reporting led to an undercount in the 2020 Census).

[21] *Id.* at 37. *See also The Trump Administration Got Exactly What It Wanted From The 2020 Census*, Wash. Post (Mar. 12, 2022), https://www.washingtonpost.com/opinions/2022/03/12/trump-administration-got-exactly-what-it-wanted-2020-census/.

[22] *See The Currency of Our Data: A Critical Input Into Federal Funding*, U.S. Census Bureau (Jun. 14, 2023), https://www.census.gov/library/fact-sheets/2023/adcom/federal-funding-distribution.html.

[23] *See The Power of Latinos in American Democracy: Best Practices for Overcoming Inequities in Latino Civic Engagement*, Mi Familia Vota & Mi Familia en Acción 36-37 (2024), https://www.mifamiliavota.org/wp-content/uploads/sites/2/2024/08/MFA_C3_Report_08-21-2024_WEB.pdf.

[24] Jacob Bogage, *DHS Officials Ask IRS to Use Tax Data to Locate Up to 7 Million Immigrants*, Wash. Post (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/.

April 9, 2025
Page 6

officials have previously denied similar requests from DHS, citing the legal concerns associated with sharing taxpayer information, as improper disclosure is prohibited by federal law, including 26 U.S.C. §6103.[25] However, the new acting commissioner of the IRS is reportedly exploring ways to comply with DHS's requests.[26] As the IRS has previously shared its concern over the privacy violations that may arise from sharing this data with the DHS, it is important for the public to have access to DHS's request to the IRS and any communications, documents, and agreements between the IRS and DHS on this matter to ensure that DHS and the IRS are complying with federal law.

CREW is a nonprofit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the public's right to be aware of the activities of government officials and to ensuring the integrity of the federal government. CREW uses a combination of research, litigation, and advocacy to advance its mission. CREW intends to analyze the information responsive to this request and to share its analysis with the public through reports, press releases, or other means. In addition, CREW will disseminate any documents it acquires from this request to the public through its website, www.citizensforethics.org. The release of information obtained through this request is not in CREW's financial interest.

CREW further requests that it not be charged search or review fees for this request pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) because CREW qualifies as a member of the news media. *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381, 1386 (D.C. Cir. 1989) (holding non-profit a "representative of the news media" and broadly interpreting the term to include "any person or organization which regularly publishes or disseminates information to the public").

CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives over 150,000 page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

If you have any questions about this request or foresee any problems in fully releasing the requested records, please email me at kfarchadi@citizensforethics.org and

---

[25] *Id. See also* 26 U.S.C. §6103.
[26] *See* WaPo: DHS Seeking Personal IRS Data of 700,000 Suspected Undocumented People, Democracy Now! (Mar. 3, 2025), https://www.democracynow.org/2025/3/3/headlines/wapo_dhs_seeking_personal_irs_data_of_700_000_suspected_undocumented_people. *See also* Gabe Ferris, *Department of Homeland Security Asks IRS to Turn Over Unauthorized Workers' Addresses*, ABC30 Fresno (Mar. 6, 2025), https://abc30.com/post/department-homeland-security-asks-irs-turn-unauthorized-workers-addresses/15985583/.

April 9, 2025
Page 7

foia@citizensforethics.org or call me at (202) 408-5565. Also, if CREW's request for a fee waiver is denied, please contact our office immediately upon making such a determination.

Where possible, please produce records in electronic format. Please send the requested records to kfarchadi@citizensforethics.org and foia@citizensforethics.org or by mail to Citizens for Responsibility and Ethics in Washington, P.O. Box 14596, Washington, D.C. 20044.

Sincerely,

*Kayvan Farchadi*

Kayvan Farchadi
Senior Counsel

Exhibit B



**CITIZENS FOR
RESPONSIBILITY &
ETHICS IN WASHINGTON**

August 26, 2025

Roman Jankowski
Chief FOIA Officer
Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. AVE SE
Washington, DC 20528-065

Re: Expedited Processing Request for April 9, 2025 FOIA Request

Dear FOIA Officer:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for expedited processing of its April 9, 2025 FOIA request, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and U.S. Department of Homeland Security ("DHS") regulations.

On April 9, 2025, CREW requested in part:[1]

1) From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official[2] providing access to the Systematic Alien Verification for Entitlements (SAVE) program.[3] This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2) From January 24, 2025 to the date this request is processed, all agency records[4] relating to election officials' access to or use of the SAVE program, including:

   (a) All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

   (b) The scope, terms, and conditions of election officials' access to or use of

---

[1] CREW's April 9, 2025 request contained five additional subparts, numbered 3-7 in the original request, seeking records concerning data sharing agreements between DHS and the Census Bureau; the Census Bureau's access to or use of personally identifiable information or immigration status information from DHS; the sharing of personally identifiable information, immigration data, or tax data between DHS and the Internal Revenue Service (IRS); and DHS requests to the IRS for the return information of taxpayers. CREW is only seeking expedited processing of subparts 1 and 2 of the April 9 request at this time.
[2] "Election official" here is used to describe any state or local official involved in state or federal election administration, including a state's chief election official and members of election boards and commissions.
[3] *See* SAVE Agency Search Tool, USCIS, https://www.uscis.gov/save/about-save/save-agency-search-tool.
[4] "Agency records" here is used within the meaning of 5 U.S.C. § 552 and, unless otherwise indicated, all "agency records" sought in this FOIA request and each of its numbered and lettered subparts include communications sent or received by DHS regarding the subject matter described in that subpart.

information taken from the SAVE program; and

(c) Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

CREW now requests expedited processing of its April 9, 2025 FOIA request pursuant to FOIA, 5 U.S.C. § 552 and 38 C.F.R. 1.556(d). CREW is entitled to expedited processing because there is an "urgency to inform the public concerning actual or alleged Federal Government activity," and CREW "is primarily engaged in disseminating information," 5 U.S.C. § 552(6)(E)(v)(II). In addition, DHS should grant expedited processing because there is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv).

CREW is "primarily engaged in disseminating information" to the public. This "standard 'requires that information dissemination be the main [and not merely an incidental] activity of the requestor,'" but "publishing information 'need not be [the organization's] sole occupation.'" *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017). CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives hundreds of thousands of page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website. CREW is a credible requestor and disseminator of information often relied on by major media outlets.

Further, the facts demonstrate that (1) the request concerns a matter of current exigency to the American public; (2) the consequences of delaying a response would compromise a significant recognized interest; and (3) the request concerns federal government activity. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001).

First, the requested records concern a matter of current exigency to the American public insofar as the scope of coordination between DHS and state election officials who may be using the SAVE program to verify voter registration information may disenfranchise eligible voters seeking to participate in upcoming elections across the country in November 2025. This includes upcoming general elections in four states: New Jersey, New York, Pennsylvania and Virginia.[5] The SAVE program was originally designed to assist in verifying immigration and naturalization status for benefits eligibility—not for use in verifying an individual's eligibility to vote. Because the SAVE program "contains outdated information"[6] and DHS itself acknowledges that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status[7] (like a foreign-born child of U.S. citizens), its repurposing represents a potentially flawed application of federal authority that raises

---

[5] *See* Meg Kinnard, Which US elections are happening in 2025? Here's a look at upcoming primary and general contests, AP (Jan. 3, 2025), https://apnews.com/article/2025-elections-calendar-c7d8af00a52e6a772ea53d1f65a67f8c.
[6] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/; see also U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.
[7] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet#_ftn2.

serious and immediate concerns about voter access and the risk of erroneous disenfranchisement. Without timely public disclosure of how state election officials are using SAVE, voters will lack critical information about whether their rights may be compromised due to the misidentification of eligible voters as non-citizens. Given the immediacy of election deadlines—such as voter registration cutoffs, mail-in ballot processing, and early voting schedules—eligible voters must be informed quickly in order to determine how and whether to engage with their election officials to avoid potential disenfranchisement.

Second, delaying voters' access to information about the nature of election officials' access to or use of information taken from the SAVE program would result in the impairment of citizens' fundamental right to participate in the electoral process. Voting is constitutionally and statutorily protected as a cornerstone of democratic participation. Depending on the terms of the data sharing agreements between DHS and states, as well as any other conditions or safeguards set by DHS or election officials themselves, the use of the SAVE program in state election verification processes could lead to the wrongful disenfranchisement of eligible voters. Failure to promptly release the requested records would allow potentially unlawful practices to continue without public scrutiny. Moreover, the lack of timely disclosure may undermine the integrity of the 2025 off-cycle elections, as affected voters would be unable to take appropriate action in time to participate in these elections. The deprivation of voters' rights cannot be remedied by post-election intervention.

Finally, the management and sharing of data possessed by federal agencies concerns a federal government activity. Expedited processing will ensure that voters, advocacy organizations, and policymakers have the necessary information to assess the appropriateness and legality of this federal activity before votes are cast and counted in November 2025.

Separately, the coordination between USCIS and state election officials through the SAVE program has generated "widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). The involvement of the SAVE program in state voter verification efforts has already drawn national attention,[8] including the potential for misapplication of immigration databases in the context of elections, underscoring public concern about federal overreach and data misuse. There are growing questions about the transparency and legality of the agency's coordination with state officials, particularly given the SAVE program's acknowledged limitations.

---

[8] *See, e.g.,* Jonathan Shorman, Trump wants states to feed voter info into powerful citizenship data program, Indiana Capital Chronicle (August 20, 2025), https://indianacapitalchronicle.com/2025/08/20/trump-wants-states-to-feed-voter-info-into-powerful-citizenship-data-program/; Natalia Contreras, State election directors press for answers on using SAVE to check voter citizenship, VoteBeat (July 28, 2025), https://www.votebeat.org/2025/07/28/save-immigration-database-nased-conference-oklahoma-city-election-officials/; Natalia Contreras, As Texas embraces federal immigration database to verify voter citizenship, some experts are worried, Texas Tribune (July 22, 2025), https://www.texastribune.org/2025/07/22/texas-secretary-of-state-checks-save-database-voter-citizenship/; Issue Brief, Eligible Voters At Risk: Examining Changes to the USCIS Save System, Fair Election Center (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf; Derek Johnson & Colin Wood, The SAVE database was already a headache for states. Now it's fueling Trump's voter fraud allegations, CyberScoop (June 23, 2025), https://cyberscoop.com/voter-citizenship-verification-trump-save-database/.

The undersigned certifies that the representations in this expedited processing request are true and correct to the best of his knowledge and belief.

<u>Conclusion</u>

If you have any questions about this request, please email kfarchadi@citizensforethics.org and foia@citizensforethics.org or call (202) 408-5565. Also, if CREW's request for expedited processing is denied, please contact our office immediately upon making such a determination.

Sincerely,

Kayvan Farchadi
Senior Counsel
Citizens for Responsibility and Ethics in Washington (CREW)

Exhibit C



CITIZENS FOR
RESPONSIBILITY &
ETHICS IN WASHINGTON

September 3, 2025

Roman Jankowski
Chief FOIA Officer
Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. AVE SE
Washington, DC 20528-065

<u>Re: Freedom of Information Act and Expedited Processing Request</u>

Dear FOIA Officer:

Citizens for Responsibility and Ethics in Washington ("CREW") submits this request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Department of Homeland Security ("DHS") regulations.

Specifically, CREW requests:

1) From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official[1] providing access to the Systematic Alien Verification for Entitlements (SAVE) program.[2] This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2) From January 24, 2025 to the date this request is processed, all agency records[3] sufficient to show:

   (a) All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

   (b) The scope, terms, and conditions of election officials' access to or use of information taken from the SAVE program; and

   (c) Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

---

[1] "Election official" here is used to describe any state or local official involved in state or federal election administration, including a state's chief election official and members of election boards and commissions.
[2] *See* SAVE Agency Search Tool, USCIS, https://www.uscis.gov/save/about-save/save-agency-search-tool.
[3] "Agency records" here is used within the meaning of 5 U.S.C. § 552 and, unless otherwise indicated, all "agency records" sought in this FOIA request and each of its numbered and lettered subparts include communications sent or received by DHS regarding the subject matter described in that subpart.

Please search for responsive records regardless of format, medium, or physical characteristics.We seek records of any kind, including paper records, electronic records, audiotapes, videotapes, photographs, data, and graphical material. Our request includes without limitation all correspondence, letters, emails, text messages, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions. Our request also includes any attachments to emails and other records, and anyone who was cc'ed or bcc'ed on any emails.

If it is your position any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). If some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. *See* 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. *See Mead Data Central v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

Please be advised that CREW intends to pursue all legal remedies to enforce its rights under FOIA. Accordingly, because litigation is reasonably foreseeable, the agency should institute an agencywide preservation hold on all documents potentially responsive to this request.

### Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A) and agency regulations, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures likely will contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. *See id.* § 552(a)(4)(A)(iii). Moreover, the request primarily and fundamentally is for non-commercial purposes. *See, e.g., McClellan Ecological v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987).

The SAVE program is an online service administered by U.S. Citizen and Immigration Services (USCIS) that provides immigration status and naturalized U.S. citizenship information to federal, state, local, territorial, and tribal agencies.[4] The SAVE program does not verify citizenship status for U.S. born citizens.[5] The SAVE program was designed to help agencies verify citizenship and immigration status prior to granting benefits and licenses to noncitizens or persons with naturalized citizenship who were born outside of the U.S.[6]

On July 9, 2012, 13 states petitioned DHS for access to the SAVE program to identify noncitizens to purge their voter rolls.[7] In 2014, the Eleventh Circuit held that two Florida residents who were naturalized U.S. citizens had standing to challenge Florida's use of the SAVE program because there was a "realistic probability that they would be misidentified

---

[4] *About SAVE*, U.S. Citizen and Immigration Services (Nov. 7, 2024), https://www.uscis.gov/save/about-save/about-save.

[5] *Id.*

[6] *See Systematic Alien Verification for Entitlements (SAVE) Program*, DHS (Jun. 2020), https://www.dhs.gov/publication/systematic-alien-verification-entitlements-save-program.

[7] *See* U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

due to unintentional mistakes in the Secretary's data-matching process."[8]

While the SAVE program was created to verify eligibility for government benefits and licensing, not to verify an individual's eligibility to vote,[9] as of March 14th, 2025 ten states were registered with the SAVE program for purposes of voter registration and voter list maintenance.[10] In addition, on January 24, 2025, USCIS updated a SAVE guidance document affirming that state and local governments responsible for voter registration can use the SAVE program to "verify an individual's immigration status and naturalized U.S. citizenship."[11]

Some organizations have reported that the SAVE program "contains outdated information and can result in false matches between citizens and noncitizens who have the same name and birthdate."[12] A 2018 report noted that the SAVE program did not include all naturalized citizens and did not include citizens born to U.S. parents outside of the United States.[13] USCIS also noted in their updated guidance published on January 24th, 2025, that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status, like a foreign-born child of U.S. citizens, if they have not applied for a Certificate of Citizenship,[14] which carries a cost of $1,385.[15] It is therefore in the public's interest for these data sharing agreements to be released and to know what data states may be using to maintain their voter rolls and registration, considering that the SAVE program can lead to misidentifications between citizens and noncitizens.[16]

CREW is a nonprofit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the public's right to be aware of the activities of government officials and to ensuring the integrity of the federal government. CREW uses a combination of research, litigation, and advocacy to advance its mission. CREW intends to analyze the information responsive to this request and to share its analysis with the public through reports, press releases, or other means. In addition, CREW will disseminate any documents it acquires from this request to the public through its website,

---

[8] *Arcia v. Florida Sec'y of State*, 772 F. 3d 1335, 1341 (11th Cir. 2014).

[9] Michele Waslin, *Using SAVE to Verify Voter Eligibility Comes with Unexplored Risks*, Immigration Impact (Aug. 2, 2012),
https://immigrationimpact.com/2012/08/02/using-save-to-verify-voter-eligibility-comes-with-unexplored-risks/.

[10] State officials from Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia are registered with the SAVE program for the purposes of Voter Registration and Voter List Maintenance. *See SAVE Agency Search Tool*, U.S. Citizenship and Immigration Services (last visited Mar. 14, 2025), https://www.uscis.gov/save/about-save/save-agency-search-tool?benefit_category[]=97&benefit_category[]=98&items_per_page=50&benefit_category[0]=17.

[11] *Voter Registration and Voter List Maintenance Fact Sheet*, U.S. Citizenship and Immigration Services (Jan. 24, 2025),
https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

[12] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/.

[13] U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

[14] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet# ftn2.

[15] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet# ftn2.

[16] U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 149, (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority Voting Access 2018.pdf.

www.citizensforethics.org. The release of information obtained through this request is not in CREW's financial interest.

CREW further requests that it not be charged search or review fees for this request pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) because CREW qualifies as a member of the news media. *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381, 1386 (D.C. Cir. 1989) (holding non-profit a "representative of the news media" and broadly interpreting the term to include "any person or organization which regularly publishes or disseminates information to the public").

CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives over 150,000 page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

**Expedited Processing Request**

CREW requests expedited processing this FOIA request pursuant to FOIA, 5 U.S.C. § 552 and 38 C.F.R. § 5.5. CREW is entitled to expedited processing because there is an "urgency to inform the public concerning actual or alleged Federal Government activity," and CREW "is primarily engaged in disseminating information," 5 U.S.C. § 552(6)(E)(v)(II). In addition, DHS should grant expedited processing because there is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv).

CREW is "primarily engaged in disseminating information" to the public. This "standard 'requires that information dissemination be the main [and not merely an incidental] activity of the requestor,'" but "publishing information 'need not be [the organization's] sole occupation.'" *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017). CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives hundreds of thousands of page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website. CREW is a credible requestor and disseminator of information often relied on by major media outlets.

Further, the facts demonstrate that (1) the request concerns a matter of current exigency to the American public; (2) the consequences of delaying a response would compromise a significant recognized interest; and (3) the request concerns federal government activity. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001).

First, the requested records concern a matter of current exigency to the American public insofar as the scope of coordination between DHS and state election officials who may be using the SAVE program to verify voter registration information may disenfranchise eligible voters seeking to participate in upcoming elections across the country in November

2025. This includes upcoming general elections in four states: New Jersey, New York, Pennsylvania and Virginia.[17] The SAVE program was originally designed to assist in verifying immigration and naturalization status for benefits eligibility—not for use in verifying an individual's eligibility to vote. Because the SAVE program "contains outdated information"[18] and DHS itself acknowledges that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status[19] (like a foreign-born child of U.S. citizens), its repurposing represents a potentially flawed application of federal authority that raises serious and immediate concerns about voter access and the risk of erroneous disenfranchisement. Without timely public disclosure of how state election officials are using SAVE, voters will lack critical information about whether their rights may be compromised due to the misidentification of eligible voters as non-citizens. Given the immediacy of election deadlines—such as voter registration cutoffs, mail-in ballot processing, and early voting schedules—eligible voters must be informed quickly in order to determine how and whether to engage with their election officials to avoid potential disenfranchisement.

Second, delaying voters' access to information about the nature of election officials' access to or use of information taken from the SAVE program would result in the impairment of citizens' fundamental right to participate in the electoral process. Voting is constitutionally and statutorily protected as a cornerstone of democratic participation. Depending on the terms of the data sharing agreements between DHS and states, as well as any other conditions or safeguards set by DHS or election officials themselves, the use of the SAVE program in state election verification processes could lead to the wrongful disenfranchisement of eligible voters. Failure to promptly release the requested records would allow potentially unlawful practices to continue without public scrutiny. Moreover, the lack of timely disclosure may undermine the integrity of the 2025 off-cycle elections, as affected voters would be unable to take appropriate action in time to participate in these elections. The deprivation of voters' rights cannot be remedied by post-election intervention.

Finally, the management and sharing of data possessed by federal agencies concerns a federal government activity. Expedited processing will ensure that voters, advocacy organizations, and policymakers have the necessary information to assess the appropriateness and legality of this federal activity before votes are cast and counted in November 2025.

Separately, the coordination between USCIS and state election officials through the SAVE program has generated "widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). The involvement of the SAVE program in state voter verification efforts has already drawn national attention,[20] including the potential for misapplication of

---

[17] *See* Meg Kinnard, Which US elections are happening in 2025? Here's a look at upcoming primary and general contests, AP (Jan. 3, 2025), https://apnews.com/article/2025-elections-calendar-c7d8af00a52e6a772ea53d1f65a67f8c.

[18] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/; see also U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

[19] See Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet#_ftn2.

[20] *See, e.g.*, Jonathan Shorman, Trump wants states to feed voter info into powerful citizenship data program, Indiana Capital Chronicle (August 20, 2025),

immigration databases in the context of elections, underscoring public concern about federal overreach and data misuse. There are growing questions about the transparency and legality of the agency's coordination with state officials, particularly given the SAVE program's acknowledged limitations.

The undersigned certifies that the representations in this expedited processing request are true and correct to the best of his knowledge and belief.

## Conclusion

Where possible, please produce records in electronic format. If you have any questions about this request or foresee any problems in fully releasing the requested records, please email me at kfarchadi@citizensforethics.org and foia@citizensforethics.org or call me at (202) 408-5565. Also, if CREW's request for a fee waiver is denied, please contact our office immediately upon making such a determination.

Sincerely,

*Kayvan Farchadi*

Kayvan Farchadi
Senior Counsel

---

https://indianacapitalchronicle.com/2025/08/20/trump-wants-states-to-feed-voter-info-into-powerful-citizenship-data-program/; Natalia Contreras, State election directors press for answers on using SAVE to check voter citizenship, VoteBeat (July 28, 2025), https://www.votebeat.org/2025/07/28/save-immigration-database-nased-conference-oklahoma-city-election-officials/; Natalia Contreras, As Texas embraces federal immigration database to verify voter citizenship, some experts are worried, Texas Tribune (July 22, 2025), https://www.texastribune.org/2025/07/22/texas-secretary-of-state-checks-save-database-voter-citizenship/; Issue Brief, Eligible Voters At Risk: Examining Changes to the USCIS Save System, Fair Election Center (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf; Derek Johnson & Colin Wood, The SAVE database was already a headache for states. Now it's fueling Trump's voter fraud allegations, CyberScoop (June 23, 2025), https://cyberscoop.com/voter-citizenship-verification-trump-savedatabase/.

Exhibit D



August 26, 2025

USCIS FOIA Officer
National Records Center, FOIA/PA Office
P. O. Box 648010
Lee's Summit, MO
64064-8010

<u>Re: Expedited Processing and FOIA Request</u>

Dear FOIA Officer:

  Citizens for Responsibility and Ethics in Washington ("CREW") makes this Freedom of Information Act ("FOIA") request and request for expedited processing pursuant to FOIA, 5 U.S.C. § 552, and U.S. Department of Homeland Security ("DHS") regulations.

  Specifically, CREW requests:

1. From July 9, 2012 to the date this request is processed, all formal or informal data sharing agreements between DHS and any election official[1] providing access to the Systematic Alien Verification for Entitlements (SAVE) program.[2] This request includes agreements between DHS and the following states: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.

2. From January 24, 2025 to the date this request is processed, all agency records[3] relating to election officials' access to or use of the SAVE program, including:

  a. All formal or informal policies, determinations or conclusions (including underlying memoranda) concerning election officials' access to or use of SAVE program information taken from the SAVE program;

  b. The scope, terms, and conditions of election officials' access to or use of information taken from the SAVE program; and

  c. Privacy or data security safeguards in place for protecting personally identifiable information or immigration status information shared by DHS.

---

[1] "Election official" here is used to describe any state or local official involved in state or federal election administration, including a state's chief election official and members of election boards and commissions.
[2] *See* SAVE Agency Search Tool, USCIS, https://www.uscis.gov/save/about-save/save-agency-search-tool.
[3] "Agency records" here is used within the meaning of 5 U.S.C. § 552 and, unless otherwise indicated, all "agency records" sought in this FOIA request and each of its numbered and lettered subparts include communications sent or received by USCIS regarding the subject matter described in that subpart.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including paper records, electronic records, audiotapes, videotapes, photographs, data, and graphical material. Our request includes without limitation all correspondence, letters, emails, text messages, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions. Our request also includes any attachments to emails and other records, and anyone who was cc'ed or bcc'ed on any emails.

If it is your position any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). If some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. *See* 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. *See Mead Data Central v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

Please be advised that CREW intends to pursue all legal remedies to enforce its rights under FOIA. Accordingly, because litigation is reasonably foreseeable, the agency should institute an agencywide preservation hold on all documents potentially responsive to this request.

## **Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A) and agency regulations, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures likely will contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. *See id.* § 552(a)(4)(A)(iii). Moreover, the request primarily and fundamentally is for non-commercial purposes. *See, e.g., McClellan Ecological v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987).

The SAVE program is an online service administered by U.S. Citizen and Immigration Services (USCIS) that provides immigration status and naturalized U.S. citizenship information to federal, state, local, territorial, and tribal agencies.[4] The SAVE program does not verify citizenship status for U.S. born citizens.[5] The SAVE program was designed to help agencies verify citizenship and immigration status prior to granting benefits and licenses to noncitizens or persons with naturalized citizenship who were born outside of the U.S.[6]

On July 9, 2012, 13 states petitioned DHS for access to the SAVE program to identify noncitizens to purge their voter rolls.[7] In 2014, the Eleventh Circuit held that two Florida residents who were naturalized U.S. citizens had standing to challenge Florida's use of the

---

[4] *About SAVE*, U.S. Citizen and Immigration Services (Nov. 7th, 2024), https://www.uscis.gov/save/about-save/about-save.
[5] *Id.*
[6] *See Systematic Alien Verification for Entitlements (SAVE) Program*, DHS (Jun. 2020), https://docs.google.com/document/d/1jz6wSgg8cCzleBQP6TS7pS63RpxY9IzxyPF9NWYjbRA/edit?tab=t.0.
[7] *See* U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf (citing Scott Gessler, *Letter from Scott Gessler, Colorado Secretary of State, to Janet Napolitano, Secretary of U.S. Dep't of Homeland Security* (July 9, 2012), https://docs.google.com/document/d/1jz6wSgg8cCzleBQP6TS7pS63RpxY9IzxyPF9NWYjbRA/edit?tab=t.0 ).

SAVE program because there was a "realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process."[8]

While the SAVE program was created to verify eligibility for government benefits and licensing, not to verify an individual's eligibility to vote,[9] as of March 14th, 2025 ten states were registered with the SAVE program for purposes of voter registration and voter list maintenance.[10] In addition, on January 24, 2025, USCIS updated a SAVE guidance document affirming that state and local governments responsible for voter registration can use the SAVE program to "verify an individual's immigration status and naturalized U.S. citizenship."[11]

Some organizations have reported that the SAVE program "contains outdated information and can result in false matches between citizens and noncitizens who have the same name and birthdate."[12] A 2018 report noted that the SAVE program did not include all naturalized citizens and did not include citizens born to U.S. parents outside of the United States.[13] USCIS also noted in their updated guidance published on January 24th, 2025, that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status, like a foreign-born child of U.S. citizens, if they have not applied for a Certificate of Citizenship,[14] which carries a cost of $1,385.[15] It is therefore in the public's interest for these data sharing agreements to be released and to know what data states may be using to maintain their voter rolls and registration, considering that the SAVE program can lead to misidentifications between citizens and noncitizens.[16]

CREW is a nonprofit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the public's right to be aware of the activities of government officials and to ensuring the integrity of the federal government. CREW uses a combination of research, litigation, and advocacy to advance its mission. CREW intends to analyze the information responsive to this request and to share its analysis with the public through reports, press releases, or other means. In addition, CREW will disseminate any documents it acquires from this request to the public through its website, www.citizensforethics.org. The release of information obtained through this request is not in CREW's financial interest.

---

[8] *Arcia v. Florida Sec'y of State*, 772 F. 3d 1335, 1341 (11th Cir. 2014).
[9] Michele Waslin, *Using SAVE to Verify Voter Eligibility Comes with Unexplored Risks,* Immigration Impact (Aug. 2, 2012), https://immigrationimpact.com/2012/08/02/using-save-to-verify-voter-eligibility-comes-with-unexplored-risks/.
[10] State officials from Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia are registered with the SAVE program for the purposes of Voter Registration and Voter List Maintenance. *See SAVE Agency Search Tool,* U.S. Citizenship and Immigration Services (last visited Mar. 14, 2025), https://www.uscis.gov/save/about-save-agency-search-tool?benefit_category[]=97&benefit_category[]=98&items_per_page=50&benefit_category[0]=17.
[11] *Voter Registration and Voter List Maintenance Fact Sheet*, U.S. Citizenship and Immigration Services (Jan. 24, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.
[12] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/.
[13] U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.
[14] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet#_ftn2.
[15] *See* Calculate Your Fees, Form N-600, Application for a Certificate of Citizenship, U.S. Citizenship and Immigration Services, https://www.uscis.gov/feecalculator?form=n-600.
[16] U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 149, (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

CREW further requests that it not be charged search or review fees for this request pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) because CREW qualifies as a member of the news media. *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381, 1386 (D.C. Cir. 1989) (holding non-profit a "representative of the news media" and broadly interpreting the term to include "any person or organization which regularly publishes or disseminates information to the public").

CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives over 150,000 page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Expedited Processing Request

CREW requests expedited processing this FOIA request pursuant to FOIA, 5 U.S.C. § 552 and 38 C.F.R. 1.556(d). CREW is entitled to expedited processing because there is an "urgency to inform the public concerning actual or alleged Federal Government activity," and CREW "is primarily engaged in disseminating information," 5 U.S.C. § 552(6)(E)(v)(II). In addition, DHS should grant expedited processing because there is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv).

CREW is "primarily engaged in disseminating information" to the public. This "standard 'requires that information dissemination be the main [and not merely an incidental] activity of the requestor,'" but "publishing information 'need not be [the organization's] sole occupation.'" *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017). CREW routinely disseminates information obtained through FOIA to the public in several ways. For example, CREW's website receives hundreds of thousands of page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA. CREW also posts the documents it obtains through FOIA on its website. CREW is a credible requestor and disseminator of information often relied on by major media outlets.

Further, the facts demonstrate that (1) the request concerns a matter of current exigency to the American public; (2) the consequences of delaying a response would compromise a significant recognized interest; and (3) the request concerns federal government activity. *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001).

First, the requested records concern a matter of current exigency to the American public insofar as the scope of coordination between DHS and state election officials who may be using the SAVE program to verify voter registration information may disenfranchise eligible voters seeking to participate in upcoming elections across the country in November 2025. This includes upcoming general elections in four states: New Jersey, New York,

Pennsylvania and Virginia.[17] The SAVE program was originally designed to assist in verifying immigration and naturalization status for benefits eligibility—not for use in verifying an individual's eligibility to vote. Because the SAVE program "contains outdated information"[18] and DHS itself acknowledges that SAVE may not be able to verify the citizenship status of individuals with derived citizenship status[19] (like a foreign-born child of U.S. citizens), its repurposing represents a potentially flawed application of federal authority that raises serious and immediate concerns about voter access and the risk of erroneous disenfranchisement. Without timely public disclosure of how state election officials are using SAVE, voters will lack critical information about whether their rights may be compromised due to the misidentification of eligible voters as non-citizens. Given the immediacy of election deadlines—such as voter registration cutoffs, mail-in ballot processing, and early voting schedules—eligible voters must be informed quickly in order to determine how and whether to engage with their election officials to avoid potential disenfranchisement.

Second, delaying voters' access to information about the nature of election officials' access to or use of information taken from the SAVE program would result in the impairment of citizens' fundamental right to participate in the electoral process. Voting is constitutionally and statutorily protected as a cornerstone of democratic participation. Depending on the terms of the data sharing agreements between DHS and states, as well as any other conditions or safeguards set by DHS or election officials themselves, the use of the SAVE program in state election verification processes could lead to the wrongful disenfranchisement of eligible voters. Failure to promptly release the requested records would allow potentially unlawful practices to continue without public scrutiny. Moreover, the lack of timely disclosure may undermine the integrity of the 2025 off-cycle elections, as affected voters would be unable to take appropriate action in time to participate in these elections. The deprivation of voters' rights cannot be remedied by post-election intervention.

Finally, the management and sharing of data possessed by federal agencies concerns a federal government activity. Expedited processing will ensure that voters, advocacy organizations, and policymakers have the necessary information to assess the appropriateness and legality of this federal activity before votes are cast and counted in November 2025.

Separately, the coordination between USCIS and state election officials through the SAVE program has generated "widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). The involvement of the SAVE program in state voter verification efforts

---

[17] *See* Meg Kinnard, *Which US elections are happening in 2025? Here's a look at upcoming primary and general contests*, AP (Jan. 3, 2025), https://apnews.com/article/2025-elections-calendar-c7d8af00a52e6a772ea53d1f65a67f8c.

[18] Danielle Root & Liz Kenney, *Voter Purges Prevent Eligible Americans from Voting*, Center for American Progress (Jan. 4, 2018), https://www.americanprogress.org/article/voter-purges-prevent-eligible-americans-voting/; see also U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* 148-49 (Sep. 12, 2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

[19] *See* Voter Registration and Voter List Maintenance Fact Sheet, U.S. Citizenship and Immigration Services, https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet#_ftn2.

has already drawn national attention,[20] including the potential for misapplication of immigration databases in the context of elections, underscoring public concern about federal overreach and data misuse. There are growing questions about the transparency and legality of the agency's coordination with state officials, particularly given the SAVE program's acknowledged limitations.

The undersigned certifies that the representations in this expedited processing request are true and correct to the best of his knowledge and belief.

## Conclusion

Where possible, please produce records in electronic format. If you have any questions about this request or foresee any problems in fully releasing the requested records, please email me at kfarchadi@citizensforethics.org and foia@citizensforethics.org or call me at (202) 408-5565. Also, if CREW's request for a fee waiver is denied, please contact our office immediately upon making such a determination.

Sincerely,

Kayvan Farchadi
Senior Counsel
Citizens for Responsibility and Ethics in
Washington (CREW)

---

[20] *See, e.g.,* Jonathan Shorman, Trump wants states to feed voter info into powerful citizenship data program, Indiana Capital Chronicle (August 20, 2025), https://indianacapitalchronicle.com/2025/08/20/trump-wants-states-to-feed-voter-info-into-powerful-citizenship-data-program/; Natalia Contreras, State election directors press for answers on using SAVE to check voter citizenship, VoteBeat (July 28, 2025), https://www.votebeat.org/2025/07/28/save-immigration-database-nased-conference-oklahoma-city-election-officials/; Natalia Contreras, As Texas embraces federal immigration database to verify voter citizenship, some experts are worried, Texas Tribune (July 22, 2025), https://www.texastribune.org/2025/07/22/texas-secretary-of-state-checks-save-database-voter-citizenship/; Issue Brief, Eligible Voters At Risk: Examining Changes to the USCIS Save System, Fair Election Center (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf; Derek Johnson & Colin Wood, The SAVE database was already a headache for states. Now it's fueling Trump's voter fraud allegations, CyberScoop (June 23, 2025), https://cyberscoop.com/voter-citizenship-verification-trump-save-database/.